James A. DUCKWORTH and Third Party Services, Inc., Appellants,

v.

EMI MEDICAL, INC., Appellee.

No. 79–1707.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1980.

Decided June 9, 1980.

---

·Stephen M. Schoenbeck, St. Louis, Mo., for appellants.

Robert S. Allen, Lewis, Rice, Tucker, Allen & Chubb, Richard A. Ahrens, co-counsel, St. Louis, Mo., for appellee.

Before BRIGHT and ROSS, Circuit Judges, and HANSON,* District Judge.

HANSON, District Judge.

This private action under sections 1 and 2 of the Sherman Act and section 4 of the Clayton Act, 15 U.S.C. §§ 1, 2 and 15 (1976), was tried to a jury, which returned a general verdict against appellants, plaintiffs below.[1] This appeal raises questions about various of the instructions given and not given, and several of the district court's[2] rulings on evidence. We affirm the judgment entered on the verdict.

The appellee, EMI Medical, Inc. (EMI), developed and markets a device known as the computerized axial tomographic scanner (C.A.T. scanner), a marriage of the computer with the x-ray machine that permits the visualization of tissue structures of the human body in far greater diagnostic detail than is possible with the x-ray machine alone. EMI makes both "head" and "whole-body" units; both are sold nationwide to hospitals and medical centers (now in competition with several other manufacturers); the whole-body units cost in the neighborhood of $500,000 apiece. The scanners are warranted for one year following their installation. During that year EMI conducts monthly preventive maintenance inspections on them and otherwise services them during regular business hours without charge for parts or labor, charging only for after-hours service. EMI has developed a service organization that installs its scanners and maintains them during the warranty period; when the warranties expire, this organization is available to continue servicing the scanners, for a fee and for profit. The service organization's several district offices, which together cover the whole country, are supplied with parts and technical support from EMI's national headquarters in Northbrook, Illinois.

---

* The Honorable William C. Hanson, Senior United States District Judge, Northern and Southern Districts of Iowa, sitting by designation.

1. Appellants withdrew their § 1 claims before the case went to the jury. Appellee's counterclaim, alleging tortious interference with its business, unfair competition, and breach of duty as a former employee, was submitted to the jury, which returned a verdict against appellee. No appeal has been taken from the judgment entered on that verdict.

2. The Honorable James H. Meredith, Senior United States District Judge, Eastern District of Missouri.

In 1976 EMI set up an office in St. Louis, Missouri to install and service its scanners in a district that included parts of Kentucky, Illinois, Indiana, Iowa and Missouri. EMI employed technical personnel to perform this work, and accumulated a parts inventory in St. Louis to help expedite the repair of its scanners in the district. One of the service engineers hired was appellant James Duckworth, who began work for EMI in October 1976. While he was with EMI, Duckworth helped install its scanners, helped service them after installation, and supervised service work on them. He also aided EMI's then district manager, Frank Mortimer, in the sale of post-warranty service contracts to hospitals with EMI scanners. At that time EMI offered its customers only a limited range of post-warranty service arrangements.

Duckworth left EMI's employ on April 14, 1978. Later the same month he and a friend incorporated Third Party Services, Inc., the other appellant herein, and began to solicit the business of servicing off-warranty C.A.T. scanners, notably EMI scanners, in the St. Louis and surrounding areas. The new business started small: Duckworth and his friend each invested only $250 in it; each continued for a time to hold another job; they secured no bank financing until October 1978; and to begin with they maintained no parts inventory of their own. However, they offered services and service contracts with several advantages over those offered by EMI. Their prices were lower for similar services. Most importantly, they would perform routine maintenance during off hours without charging overtime rates, thus permitting the hospitals to keep their scanners in profitable operation more of the time during regular business hours. They offered a wider range of possible service arrangements than did EMI. Finally, they would shop around for parts, often getting them more cheaply for their customers than would have been possible through EMI. Appellants succeeded in attracting some clients away from EMI's service organization almost immediately; others came later; and the business grew to include the servicing of C.A.T. scanners made by manufacturers other than EMI, located at medical centers as far away from St. Louis as Kansas City, Missouri (about 250 miles). Nevertheless, by the time of trial (July 16–20, 1979), EMI still occupied some 76% (down from about 95% in April 1978) of what appellants claim is the relevant market for purposes of this case: the market for servicing EMI-made C.A.T. scanners at institutions within a 150-mile radius of downtown St. Louis.

Appellants' claim at trial was that they were prevented from capturing more of EMI's business—and were thus injured in their business or property—by reason either of EMI's monopolization or of its attempted monopolization of the allegedly relevant market. The allegedly illegal acts committed by EMI were primarily those of Frank Mortimer, EMI's St. Louis district manager. When he learned in April or May of 1978 of appellants' efforts to establish a competing service business, he contacted all his customers with the aim of persuading them to stay with EMI. Among other things, he informed them that EMI's rates for certain services would be going down, and that EMI would now be offering a wider range of post-warranty service arrangements than formerly; and he made various comparisons between appellants' abilities to service EMI scanners and EMI's. After Mortimer contacted his customers, several of them that had expressed an interest in appellants' services decided to stay with EMI.

EMI does not seriously dispute that Mortimer did substantially what appellants say he did. It does challenge appellants' proof of each other element of both their theories of recovery, including appellants' market definition, their claim that EMI possessed monopoly power or came dangerously close to possessing such power even in the suspect market, their claim that EMI intended to monopolize the market, and their theory of causation of their alleged injuries. EMI moved for a directed verdict both at the close of appellants' evidence and at the close of all the evidence. Rulings on these motions were deferred, and rendered moot by the verdict. Nevertheless, EMI has argued on appeal that the judgment should be affirmed for the reason that appellants

failed to make a submissible case. Without adopting this view, we will say that upon our review of the record we agree that appellants' case at trial was tenuous at best. As for the issues raised in this appeal, we find it necessary to consider explicitly only two of the numerous assignments of error brought before us.

1. The district court charged the jury at length on both of appellants' theories of recovery, using for this purpose instructions drawn largely from 3 Devitt and Blackmar, Federal Jury Practice and Instructions § 90 (1977). In addition, the court gave several special instructions requested by the parties. Included among these was the following, given over appellants' objection:

> The Court instructs the jury that after plaintiffs began competing with it, EMI had the lawful right to compete with plaintiffs in meeting the plaintiffs' quoted price for services, in offering contracts with comparable terms and in comparing plaintiffs' ability to service the hospitals' scanners with EMI's *so long as EMI did not engage in conduct evidencing an intention to obtain or maintain a monopoly in the servicing of scanners.* [Emphasis added.]

Appellants argue that the district court committed reversible error by giving this instruction because, they claim, the instruction misleadingly suggested to the jury that they would have to find that EMI committed acts *in addition to or other than* those enumerated in the instruction in order to find that EMI intended to obtain or maintain a monopoly in the servicing of scanners. Appellants, citing *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (D.Mass.1953), *aff'd per curiam*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), argue that the very acts mentioned could be used as evidence of illegal monopolization or attempted monopolization, especially when committed by a firm with as much power in the market as that allegedly held by EMI.

▬ Whatever the merits of the challenged instruction as an abstract statement of the law, a topic that might be long discussed, we cannot find that in the context of the rest of the instructions it was seriously misleading in the way suggested by appellants. The instructions given by the district court on the elements of monopolization and attempted monopolization, which were adapted from 3 Devitt and Blackmar, *supra*, §§ 90.27 and 90.29, clearly permitted the jury to find, from the evidence of EMI's meeting appellants' quoted prices for services, its offering contracts with comparable terms, and its comparing appellants' ability to service scanners with EMI's, that EMI had monopolized or attempted to monopolize the market (assuming adequate proof of the other elements of the charged offenses). Any possible implication in the challenged instruction that only *other* acts than these could evidence EMI's wrongful intent was dispelled by the surrounding instructions. It goes without saying that instructions must be read as a whole, and that what is potentially misleading in isolation may not be so in context.

2. Prior to trial appellants deposed administrators at two of the hospitals whose business they claimed they had lost because of EMI's allegedly illegal activities. The testimony of these officials, Mr. Horrall and Mr. Lovett, did not particularly confirm appellants' theory of causation of their alleged injuries, and appellants did not call either of them to testify at trial; but on the other hand neither did EMI. Instead, EMI had its expert witness read the depositions of Horrall and Lovett prior to trial; and then at trial the following colloquy took place during the direct examination of the expert:

> Q [By counsel for EMI]  What did you find in the depositions of Steve Horrall and Mr. Lovett with respect to their decision that was made in this case?

> A  The two hospitals involved, upon the expiration of the warranty had to decide whether they were going to stay with EMI or accept the offer of Mr. Duckworth.

> They considered all aspects of the services offered by the two companies and they decided to stay with EMI in spite of the fact that Mr. Duckworth was offering them a lower price.

> Q  What was the expressed reason for that in their depositions?

[Counsel for appellants]: Your Honor, I'm going to object to this witness being asked to characterize the testimony of—well, nontestimony of other witnesses in this case.

[Counsel for EMI]: Your Honor, this is an expert witness and he can rely upon the evidence, doesn't have to be brought into the courtroom, and it wasn't brought in by [counsel for appellants], but the expert witness can rely on it.

[Counsel for appellants]: Your Honor, this witness is purporting to tell the jury the reasons that the hospitals have—I feel that the hospital personnel are the people who are the only ones who can give those reasons.

[Counsel for EMI]: You chose not to bring them in and this expert is here testifying.

THE COURT: Well, this—the expert cannot state what they said because then that becomes hearsay.

[Counsel for EMI]: But he can state—

THE COURT: But he can state an opinion.

[Counsel for EMI]: Right.

THE COURT: As to the result of what they said.

[Counsel for EMI]: Right

Q   [By counsel for EMI]   Do you have an opinion on that?

A   Yes I do.

Q   What is it?

A   This may be around the barn but this, there are two kinds of people in the world.  There are some people who are willing to take a risk or more risk, and there's some people take more risk and get a lower price.  Other people who are willing to, less willing to accept risk, they are willing to pay money to avoid taking that risk.

Both of these hospitals had had experience under the warranty with the EMI scanner and the EMI service.  They had had no experience with Mr. Duckworth, his ability to service the machines, his ability to provide parts when needed, so that they chose to pay a higher price and have the certainty associated with EMI during the warranty period.

Appellants argue that the district court committed reversible error by permitting EMI's expert to testify in this way.

■ The court properly sustained the objection to the question calling for hearsay, and no hearsay came in in the testimony now in question.[3]  We think that the testimony may nevertheless have been objectionable on the ground that the matter testified to was not a proper subject for expert testimony, even testimony in the form of an opinion.  However, it is clear that no timely objection was made stating this or any other ground of objection to the district court's ruling that EMI's expert could give his opinion "as to the result" of what Horrall and Lovett said in their depositions, nor was a motion to strike made after the testimony came in.  Appellants are therefore precluded by F.R.Evid. 103(a)(1) from predicating error on the court's ruling or its aftermath.  Nor do we find that the ruling amounted to the sort of plain error affecting appellants' substantial rights that would warrant reversal even though not brought to the attention of the trial court.  We note that appellant Duckworth himself testified that the hospitals whose business he solicited had a tendency to be conservative and to scrutinize new businesses such as his very carefully.  See Trial Transcript at 194–95.  EMI's expert did not say much more than that in the testimony now objected to.

We have carefully considered each of the other points raised by appellants.  There is no good reason for us to discuss them here, except to say that we find in them, individually and collectively, no sufficient ground for reversal of the judgment.  Cf. Rule 14, Rules of the Eighth Circuit.

AFFIRMED.

---

3.  Opinion testimony by experts is of course not objectionable merely because it is *based* on inadmissible evidence, like hearsay.  *See* F.R. Evid. 703.